IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| TIMOTHY R. DAVIS, | | |
| | Plaintiff, | Civil No. 04-6260-AS |
| v. | | FINDINGS AND RECOMMENDATION |
| JO ANNE B. BARNHART,<br>Commissioner of Social Security, | | |
| | Defendant. | |

ASHMANSKAS, Magistrate Judge:

Plaintiff Timothy R. Davis ("Davis") filed this action under section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. §405(g), to review the final decision of the Commissioner of Social Security (the "Commissioner") who denied him social security disability insurance benefits ("Benefits").

## PROCEDURE

On or about November 13, 2001, Davis filed an application for Benefits alleging an onset date of September 30, 1999. The application was denied initially, on reconsideration, and by the Administrative Law Judge (the "ALJ") after a hearing. The Appeals Council denied review and the

ALJ's decision became the final decision of the Commissioner.

## FACTS

Davis is fifty-three years old. He graduated from high school and a two-year business college, majoring in business management. His past relevant work experience includes industrial marketing and technical specialist. Davis has not been involved in a successful work attempt since late 1999. Davis alleges disability because of congestive heart failure, diabetes, obesity and depression. Davis met the insured status requirements entitling him to Benefits through the date of the ALJ's decision.

### Testimony

Davis testified that after his congestive heart failure was diagnosed, he continued working six hours a day until he used up his accumulated sick leave and family medical leave. He was tired by the end of the day but he was able to sustain the six-hour work days four days a week and would occasionally need to leave early on the fifth day due to fatigue and inability to concentrate. He testified that his primary difficulty was traveling to trade shows and customer's job sites to conduct training or demonstrate products. He didn't think he would have problems with an office or desk job. He was offered a position in the corporate office in Beaverton when his job in Eugene was eliminated but he did not want to move and opted to quit working. He isn't interested in an inside sales job because that would be "going back twelve notches." Transcript at 422.

Davis testified that his condition has not worsened since he stopped working and he is able to do a lot of things on a lot of days. He is able to mow the front lawn but is not able to mow both the front and the back without stopping. He shops for groceries with his wife and walks the mall for exercise. He has studied classical music and plays the piano quite a bit. Sometimes, his body

"closes down" and he needs to sit or lay down and he suffers from dizzy spells. He has to use the restroom every 20 minutes in the morning as a result of his diuretic medication. He thinks that he could still work six hours a day four or five days a week but would have trouble with regular contact with the public due to his depression.

Davis testified that his gout is currently managed with pain medication and that he continues to have a ringing in left ear but is able to hear different frequencies. He has added insulin therapy for his diabetes.

Anita Davis, Davis's wife, testified that on bad days, Davis is unable to do anything, will cry at the smallest thing and is just angry at the world. He has these bad days a couple of times a week. Since March 2000, she thinks Davis has improved as a result of his heart and diabetes medication. He spends about ten to twelve hours a week helping Mrs. Davis with her home business selling components for industrial computers.

Orin H. Bruton, M.D., attended and testified at the hearing. After reviewing Davis's entire file, he testified that, while suffering from idiopathic cardiomyopathy for the entire year of 1999, Davis's heart function was back to the normal range by January 2000. The exercise stress test of April 2002 was limited by Davis's physical capacity to exercise, primarily as a result of his obesity, and indicated a New York Heart Class II. Dr. Bruton did not consider the diabetes to be disabling because it was fairly stable and felt that Davis's obesity would limit him to physical activity at the light or sedentary level.

**Medical Evidence**

Davis was admitted to Sacred Heart Medical Center in Eugene, Oregon, in January 1999, to rule out coronary disease following his inability to complete an exercise stress test coupled with the

presence of multiple risk factors for heart disease. He was released the next day with "no significant heart disease" and a diagnosis of presumed idiopathic dilated cardiomyopathy, as well as hypertension, congestive heart failure and diabetes, all treated with medications. He had a long-standing history of being greater than 100 pounds overweight, was challenged to lose 100 pounds over the next 12-24 months and was provided with specific dietary instructions in an appropriate low-fat, low-cholesterol, diabetic, weight-reducing diet.

Davis reported feeling quite well later that month with the ability to perform very high levels of activity on good days and feeling generally fatigued a day after he pushes himself too hard. Two weeks later, Davis complained to Michael J. Gitter, M.D., that he was unable to walk at a slow pace for greater than 10 minutes before developing significant congestive heart failure. Dr. Gitter encouraged Davis to continue to walk and gradually increase his exercise with daily walking but did not feel that Davis was able to handle the new job offered by Davis's employer, which required extensive travel over six states and very long workdays. Dr. Gitter offered to provide a note to Davis's employer that Davis did not have the cardiovascular status or the exertional capacity to maintain the level of activity required for the new position. On March 25, 1999, Dr. Gitter indicated that:

> Tim may return to work at Platt with the following restrictions:
> 
> 1. no more than a 6 hour workday, effective 3/25/99 and ongoing
> 
> 2. no driving extended distances greater than 100 mi. 3/25/99 and ongoing
> 
> 3. As per pt. discretion regarding travel accommodation 3/25/99 and ongoing.

Transcript at 165.

In early April, 1999, Dr. Gitter reported that he was "thrilled to learn that [Davis] has been

free of cardiopulmonary symptoms. He has had no congestive heart failure or dizzy spells since starting the Coreg." Transcript at 164. The only disappointing news was that Davis had not been following the low-fat, low cholesterol, weight-reducing diet. In May 1999, Davis indicated that he experienced mild symptoms in late afternoon about three days a week but that he obtained prompt relief by taking medication. By November 1999, Davis had lost weight, was exercising 20-30 minutes in a heart healthy fashion every day and was experiencing no congestive heart failure symptoms, with the exception of mild fatigue between 2:00 and 3:00 in the afternoon. This mild fatigue was no longer occurring in December 1999, when Davis stopped taking a diuretic and began enjoying more energy throughout the course of the day. Dr. Gitter reported that Davis was maintaining normal LV function with no recurrence of congestive heart failure symptoms. On April 4, 2000, Richard C. Padgett, M.D., examined Davis and reported that his overall LV systolic function was improving and that Davis "is now back to work and is having no congestive symptoms." Transcript at 156.

Davis was seen in mid-2001 by Claudia Linn, R.N., C.D.E., C.P.T. Davis was considering changing his diabetic medicines to insulin shots solely for financial reasons. During this time, Davis stopped his TZD and reduced his glucophage and his glipizide and his BG remained in goal. Ms. Linn indicated that Davis did not need insulin at that time and that any switch to insulin would be more economical based on the decrease in the amount of medication needed to maintain his BG level. She recommended increased activity, noting that it was the least expensive of all the diabetes medications.

In later October 2001, a chest x-ray revealed a normal heart and pulmonary vasculature with no acute cardiopulmonary disease or change from x-rays taken on Decmeber 28, 1998, right before

Davis's admittance to Sacred Heart Hospital. On November 15, 2001, Paul G. Curtin, M.D., considered Davis to be disabled and unable to engage in any type of employment.

> Mr. Davis has been under my care since 1997. In December of 1998, Tim developed an idiopathic cardiomyopathy which resulted in congestive heart failure. This was superimposed on pre-existing conditions of diabetes, hypertension and obesity. Tim was evaluated and cared for by cardiology and has indeed stabilized. However, due to his illness, he will continue to have persistent and chronic problems with fatigue, dyspnea, and low exercise tolerance. I do not believe that he is able to maintain gainful employment due to his medical conditions. Tim has been entirely compliant with all medical procedures and therapeutic options that we have tried with him.

Transcript at 274.

On April 18, 2002, Robert A. Bender, M.D. examined Davis and performed an exercise EKG, which Davis was able to sustain for only five minutes. Dr. Bender noted that Davis had a well-documented cardiomyopathy with a normal resting EKG and no sign of ischemia on exercise EKG. He reported marked limitation of Davis's exercise capacity and attributed that to multiple factors, including his heart, poor conditioning and obesity. Chest X-rays taken at this time were unremarkable.

Charles Spray, M.D., reviewed the medical records at the request of the Commissioner and determined that while Davis suffered from congestive heart failure and obesity, he was not disabled as of May 1, 2002. Dr. Spray felt that Davis retained the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk and sit six hours in an eight-hour work day with regular breaks. He opined that Davis was unrestricted in his ability to push and/or pull hand and foot controls, climb ramps and stairs, and balance but that he was limited to occasional kneeling, crouching and crawling, should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, should never climb a ladder, rope or scaffolding and should avoid all such hazards. Dr. Spray agreed with the limitations imposed by Dr. Gitter but felt that Dr. Curtin's

limitations of November 15, 2001, were not supported by Davis's April 2002 treadmill performance to 6.5 METS with no abnormal findings. Bill Hennings, Ph.D., considered Davis's mental health issues and opined that Davis was moderately limited in his ability to: 1) work in coordination with or proximity to others without being distracted by them; 2) interact appropriately with the general public; and 3) set realistic goals or make plans independently of others. Dr. Hennings also noted that Davis was mildly restricted in his activities of daily living and would experience mild difficulties in maintaining social functioning. Three months later, Sharon Eder, M.D., diagnosed Davis with obesity and diabetes mellitus but did not consider the congestive heart failure to be significant. She limited Davis to lifting and carrying 20 pounds occasionally and 10 pounds frequently but did not impose any other restrictions and felt that Davis retained the ability to consistently perform light level exertion. Dr. Eder, as well as Frank Lahman, Ph.D., affirmed the prior determination of no disability.

Around this same time period, Davis was examined by Lisa Sjodin, M.D., who had previously reviewed Davis's medical record. Davis reported having a psychiatric history dating back to a "break down" when he was three years old. He tried to commit suicide while in military service in 1969 and was discharged with a diagnosis of passive aggressive personality. He was prescribed vivactil and alprazolam by his primary care physician in about 1996, which he continues to take. He rated his depression at a moderate level of seven to eight on a scale where ten is the most severely depressed. He tends to eat more when he is depressed, using food as a "pacifier." Transcript at 240.

Davis indicated that he was sleeping well, between eight and twelve hours each night. He bathes and dresses himself daily after getting up about 10:00 a.m. and uses the internet for two to

three hours at a time three to four times during the day. He is able to drive but his wife does most of the driving because of Davis's inappropriate level of anger. He does not help out with any of the household chores or cooking. He was terminated from his last job when he refused to relocate to Beaverton, which was the only location that could accommodate his need for light duty. Davis reported that he had not been released by his medical providers to return to work.

Dr. Sjodin diagnosed Davis with major depressive disorder, recurrent and moderate. She attributed his obesity to his depression and his general fatigue to both his depression and his cardiac problems. She did not think that Davis's mental health would improve over the next twelve months, acknowledging his history of major depressive episodes and his current moderate depression with occasional severe episodes. Dr. Sjodin opined that Davis was cognitively intact with good judgment.

On June 3, 2002, Dr. Curtin altered his opinion on Davis's ability to work and stated that:

> Mr. Davis has well treated and well compensated congestive heart failure, cardiomyopathy and diabetes. I believe that if he is compliant with his medical program he would be able to do an 8 hour day 5 days a week with normal breaks. This would need to be a sedentary office type position. I believe that anything more physical than that would preclude his gainful employment.

Transcript at 270. In the period between the November 2001 statement of total disability and this finding that Davis had the ability to work full time at a "sedentary office type position," Dr. Curtin treated Davis for: 1) a recurrent cough, which was treated with Robitussin-DM; 2) foot pain, which appeared to be tendinitis and was treated with moist heat and elevation; and 3) crampy, burning pain in his calves during exercise, which did not appear to be related to his diabetes but was diagnosed as probable peripheral vascular disease.

Subsequently, Dr. Curtin treated Davis for: 1) abrupt hearing loss, which resolved on its own;

2) a bad cough, which was diagnosed as bronchitis, possible mild pneumonia, and treated with antibiotics; 3) foot pain, which was diagnosed as probably gout and early cellulitis in diabetic; 4) depression; and 5) ongoing monitoring of diabetes and related medications. On January 22, 2004, Dr. Curtin again changed his opinion on Davis's ability to work, reporting that:

> Timothy R. Davis carries a multitude of medical diagnoses including congestive heart failure secondary to cardiomyopthay, type II diabetes recently started on insulin, hyperlipidemia, gout, hypertension and obesity. He has been extremely compliant in his medical programs while stable on a day-to-day basis. His multiple medical problems will predispose Mr. Davis to fatigue, decreased exercise tolerance and an increased likelihood of infectious problems.
>
> I believe that Mr. Davis could perform an eight-hour per day job with normal breaks provided that this was "light duty" work requiring no lifting, repetitive bending and other forms of heavy work and/or manual labor. However, I do not feel that Mr. Davis would be able to do this on a sustained basis and would likely miss more than 2 days per month due to his multiple medical illnesses.

Transcript at 370.

## Vocational Evidence

Mark A. McGowan attended the hearing as a vocational expert. He testified that Davis's past relevant work was classified as light work, with an alternative classification requiring lifting 50 pounds, which would qualify as medium work. McGowan was then asked to consider a "52-year-old individual, high school graduate with his past occupation" and determine whether there were any light occupations other than Davis's past relevant work, that the individual could perform. McGowan opined that there were numerous sales jobs that were transferable across industry lines that Davis could perform. When asked if Davis had skills that were transferable to a sedentary occupation, McGowan indicated that he hadn't found any but that he was not completely convinced in his own mind that there weren't any. The problem was that sedentary jobs in the engineering field were research related and required an licensed engineer, which Davis was not. A number of

supervisor jobs were sedentary but Davis's supervisory experience occurred more than 15 years previously so did not qualify for past relevant work experience. McGowan concluded that there were probably no sedentary jobs with transferable skills similar to Davis's. In response to a question from Davis's counsel, McGowan indicated that Davis would not be able to perform any job if he was limited to working four days in a five-day workweek.

## ALJ Decision

The ALJ determined that Davis suffered from the severe impairments of insulin-dependent diabetes and obesity as well as the non-severe impairments of congestive heart failure and gout. However, the impairments, considered separately or together, did not meet or equal the impairments listed in Appendix 1, Subpart P, Regulation No. 4. The ALJ then found that Davis retained the capacity to perform light work and that these restrictions did not eliminate his past relevant work of electronics products and systems sales engineer. Accordingly, the ALJ found Davis was not disabled under the Act.

The ALJ found that Davis's allegations regarding his limitations not totally credible. The ALJ felt Davis's testimony that his use of a diuretic required frequent trips to the bathroom was not supported by the record. Davis did not report the problem to his physicians and it appears likely that, if reported, the problem could be solved by an adjustment of medications. Similarly, Davis's allegation that he can not perform light work on a sustained and regular basis and his testimony that he becomes incapacitated and must lie down within a day of performing such work was considered to be inconsistent with his reports to Dr. Gitter that he had only mild symptoms, and then no symptoms relating to his congestive heart failure. There was no indication, either medically or from Davis's self reports, of any relapse in his heart condition and there was little evidence of a medically-

determinable impairment that would account for his current subjective symptoms. Also, Davis testified that he stopped working because he didn't want to move from Eugene to Portland, not because he was incapacitated by his health.

Similarly, the ALJ discounted Dr. Curtin's opinion that Davis was not able to sustain light work over a month. He noted that Dr. Curtin's opinions had varied widely, despite an essentially static medical condition, and were inconsistent with a medical record which showed that Davis's heart condition had not only stabilized, it had, in fact, resolved. Additionally, the ALJ mentioned that both Dr. Bruton and Dr. Eder felt that Davis could perform light work.

## STANDARD OF REVIEW

The Act provides for payment of Benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). The burden of proof to establish a disability rests upon the claimant. Gomez v. Chater, 74 F.3d 967, 970 (9th Cir.), cert. denied, 117 S. Ct. 209 (1996). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2) (A).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either Benefits because he or she is disabled. 20 C.F.R. §§ 404.1520;

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past. If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied. 20 C.F.R. §§ 404.1520(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Distasio v. Shalala, 47 F.3d 348, 349 (9th Cir. 1995) The claimant is entitled to Benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

When an individual seeks Benefits because of disability, this court must review the case to see if the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). It is more than a scintilla, but less than a preponderance, of the evidence. Id.; Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990). Even if the Commissioner's decision is supported by substantial evidence, it must be set aside if the proper legal standards were not applied in weighing the evidence and in making the decision. Gonzalez, 914 F.2d at 1200. The court must weigh both the evidence that supports and detracts from the Commissioner's decision. Id. The trier of fact, and not the reviewing court, must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the Commissioner. Gomez, 74 F.3d at 970.

DISCUSSION

Davis asserts that the ALJ erred by failing to give clear and convincing reasons for rejecting the opinion of Dr. Curtin and his own testimony. Then, arguing that the ALJ should have found Davis was limited to sedentary work, Davis asserts that he has adequately established that he is disabled under the Medical-Vocational Rules as of his 50th birthday.

**Rejection of Treating Physician's Opinion**

It is well settled that "greater weight is afforded to the opinion of a treating physician than to that of [a] non-treating physician, because the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." Ramirez v. Shalala, 8 F.3d 1449, 1453 (9th Cir. 1993)(internal quotations omitted). The ALJ must give "clear and convincing reasons" for rejecting the uncontroverted opinion of a treating physician and "specific, legitimate

reasons" for rejecting a controverted opinion of a treating physician. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). See also <u>Lester v. Chater</u>, 81 F.3d 821, 830-32 (9th Cir. 1995).

Here, Dr. Curtin's opinion is controverted not only by other physician's opinion, he contradicts his own opinion. Dr. Curtin states in November 2001 that Davis is unable to work in any capacity. Less than seven months later, he states that Davis is able to work full time at a "sedentary office type job." Then, in early 2004, Dr. Curtin represents that Davis could engage in full-time light work but would be expected to miss more than two days a month. The medical records show that Davis's condition remained fairly constant during this time period and does not support the rather extreme changes in Dr. Curtin's opinion. Additionally, Dr. Curtin's 2001 statement of total disability is contradicted by Dr. Gitter's opinion of March 1999 that Davis was able to work six-hour days only three months after the diagnosis of his heart condition and before Davis enjoyed his eventual full recovery from the symptoms of congestive heart failure. Both Dr. Spray and Dr. Eder opined in the middle of 2002 that Davis could perform the full range of light work, which directly contradicts Dr. Curtin's 2002 statement that Davis was limited to sedentary office type work. Dr. Bruton also testified at the hearing that Davis could perform both light and sedentary work.

The ALJ stated in his opinion that he rejected Dr. Curtin's opinions because they varied widely, despite an essentially static medical condition, and were inconsistent with a medical record which showed that Davis's heart condition had not only stabilized, it had, in fact, resolved. This statement is supported by the record. The ALJ correctly provided specific and legitimate reasons for rejecting the controverted opinion of Dr. Curtin.

/ / / / /

**Rejection of Claimant's Testimony**

In assessing the credibility of the claimant, an ALJ must consider the following factors:

(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . The ALJ must also consider the claimant's work record and the observations of treating and examining physicians and other third parties. Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

The ALJ can reject a claimant's testimony about his or her limitations only by offering clear and convincing reasons supported by specific facts in the record that demonstrate an objective basis for his disbelief. Regennitter v. Commissioner, 166 F.3d 1294, 1296-97 (9th Cir. 1999); Lester v. Chater, 81 F.3d at 834.

The ALJ expressed concern that Davis quit his job when he was asked to relocate to the Portland area and noted that Davis's medical condition was not the reason he stopped working. Also relevant to this concern is Davis's testimony that working a desk job would be a different story with regard to his disability and his refusal to consider a sales position because he felt it was beneath him. The ALJ also noted Davis's failure to report some of his stated medical problems to his physicians, such as the need to urinate frequently, which likely could have been alleviated with an adjustment in medication had Davis had reported the problem. Also, from his own reports, the limitations resulting form congestive heart failure had resolved by late 1999, when Davis reported to Dr. Gitter that even his mild fatigue was no longer occurring and he was enjoying more energy throughout the course of the day. Davis testified that he has a lot of good days where he can do a lot of things and he reported to Dr. Sjodin that he uses the internet for two to three hours at a time three to four times during the day. Davis's wife testified that Davis helped her in her business ten to twelve hours a week. Based on this activity, it appears that Davis's statement that he is unable to work full-time at

any job is less than trustworthy.

The ALJ provided numerous reasons for questioning Davis's testimony, all of which are adequately supported by the record. The ALJ gave clear and convincing reasons rejecting Davis's testimony and did not err in doing so.

Davis has not established that the ALJ erred in determining that he retained the ability to perform light work. Accordingly, Davis is unable to support his third argument that

he is limited to sedentary work and disabled under the Medical-Vocational Rules as of his 50th birthday.

## CONCLUSION

The Commissioner's findings on Davis's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner should be affirmed.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **June 28, 2005**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 13th day of June, 2005.

                                            /s/ Donald C. Ashmanskas
                                               DONALD C. ASHMANSKAS
                                               United States Magistrate Judge